NOT FOR PUBLICATION (Doc. Nos. 129, 130)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| JOHN MOORE, et al. | : |
| Plaintiffs, | : Civil No. 07-5444 (RBK/AMD) |
| v. | : |
| ATLANTIC COUNTY, et al., | : **OPINION** |
| Defendants. | : |

**KUGLER**, United States District Judge:

Before this Court are the motions of Plaintiffs John Moore ("Moore"), Alphonso Johnson ("Johnson"), Mel Free El ("El"), and Donald Dillard ("Dillard") (collectively "Plaintiffs") for summary judgment pursuant to Fed. R. Civ. P. 56, (Doc. No. 130), and of Defendants Atlantic County and Gary Merline (collectively "Defendants") for summary judgment pursuant to Fed. R. Civ. P. 56, (Doc. No. 129). This matter arises out of the alleged unconstitutional strip searches of Plaintiffs after they were arrested for non-indictable offenses. For the reasons expressed herein, Plaintiffs' motion is denied, and Defendants' motion is granted.

**I.     BACKGROUND AND PROCEDURAL HISTORY[1]**

---

[1] When considering a motion for summary judgment, the Court views the facts underlying the claims in the light most favorable to the non-moving party. See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1230 (3d Cir. 1993). Since both parties have moved for summary judgment, the Court views the facts in this Opinion in the light most favorable to the party against whom the motion under consideration is made. See Clevenger v. First Option Health Plan of New Jersey, 208 F. Supp. 463, 469 (D.N.J. 2002) (the Court must "view the evidence on each motion in the light most favorable to the party opposing the motion.")

1

This is a putative class action lawsuit to redress the alleged deprivation of civil rights suffered by individuals who entered the Atlantic County Correctional Facility ("ACCF") and were subjected to strip searches, regardless of the crime with which they were charged. Named Plaintiffs, Moore, Johnson, El, and Dillard, were charged with "misdemeanors, non-indictable offenses, traffic, or minor violations and civil enforcement proceedings,"[2] yet were strip searched, allegedly in violation of their rights under the Fourth Amendment to the United States Constitution, Article I, Paragraph 7 of the New Jersey Constitution, and the New Jersey Strip Search Statute, N.J.S.A. 2A:161A et seq. (See Second Amended Complaint ("SAC") ¶¶ 2, 3, 36, 46, 55.) The undisputed proposed class period is from November 8, 2005 through May 22, 2008. (Pls.' Statement of Undisputed Material Facts ("SUMF") ¶ 2.)[3]

### A. Individual Plaintiffs

Plaintiff Moore was arrested and detained on two occasions during the class period for failing to make child support payments. (Ex. R to Pls.' Mtn., Deposition of John Moore ("Moore Dep.") 102:12-14, 211:18-25; Ex. A to Pls.' Mtn., Moore Arrest Warrants.) After arriving at ACCF on these occasions, Moore was brought into a room and told to remove his clothes, lift his genitals, squat and spread his cheeks while an officer shined a flashlight in his rectum. (Moore Dep. 142:11-19, 158:4-20.) On at least one occasion, Moore signed a Consent to Strip Search Form ("Consent Form"), (Ex. F to Pls.' Mtn.), but he does not remember doing so. (Moore Dep. 191:18-21.) On the other occasion, there is no record of a signed Consent Form. (Ex. G to Pls.' Mtn., Report of Officer Shaun Perry.)

---

[2] For the purpose of this Opinion, such charges will simply be termed "non-indictable" offenses.

[3] Unless otherwise noted, when citing to a party's SUMF, the citation incorporates the opposing party's corresponding admission of that fact.

Plaintiff Dillard owed back child support at the time of his arrest on August 29, 2007. (Ex. S to Pls.' Mtn., Deposition of Donald Dillard ("Dillard Dep.") 16:15-17:13, 30:8-24, 35:5-11.)  When he arrived at ACCF, he was strip searched. (Pls.' Br. at 7.)[4]

Plaintiff El was incarcerated at ACCF for unpaid traffic fines on three occasions within the class period. (Ex. P to Pls.' Mtn.)[5] The strip search process was the same each time: El was taken into a bathroom, asked to get undressed, open his mouth, lift his testicles, turn around, bend over, and cough, while an Officer looked at his rectum. (Ex. T to Pls.' Mtn., Deposition of Mel Free El ("El Dep.") 78:3-10.)  On at least one occasion, El did not sign a Consent Form. (Ex. G. to Pls.' Mtn., Report of Officer Shaun Perry.)  On one occasion, El wrote "All Rights Reserve" on his unsigned and undated Consent Form. (Ex. Q to Pls.' Mtn.)

Plaintiff Johnson alleges that he was arrested for an outstanding child support warrant, transported to ACCF, and strip searched upon his admission, without signing a Consent Form.[6]

### B. Atlantic County's Strip Search Policy

During the class period, the strip search policy in effect at ACCF provided that persons admitted to the facility for non-indictable offenses could not be strip searched[7] unless they signed

---

[4] Plaintiffs cite to portions of Dillard's Deposition to support the fact that he was strip searched on August 29, 2007, but fail to include the cited portions of the deposition in the attached exhibits.  Nonetheless, the parties do not dispute that Dillard was subjected to a search, and viewed in the light most favorable to the Plaintiff, the Court will accept Plaintiffs' representation for the purpose of this Opinion.  Moreover, Plaintiffs allege that Dillard signed a Consent Form, but that he "never read" the form and "believed [it] was the property sheet." (Pls.' SUMF ¶24.) Plaintiffs cite to portions of Dillard's Deposition to support the fact that he did not read the form "but merely did what he was told," but again fail to include the cited portions of the deposition in the attached exhibits. (Id.)  The Court notes that Defendants have submitted evidence that Dillard signed two Consent Forms within the period at issue, but these are dated February 16, 2006, and February 25, 2007, and not August 29, 2007, the relevant date on which Dillard alleges he was arrested and strip searched. (See Ex. O to Defs.' Mtn.)

[5] The Court notes that Exhibit P shows that the dates of arrests were within the class period, but it does not state the reason for arrest.  Nonetheless, the parties do not dispute that El was arrested for a non-indictable offense.

[6] Plaintiff relies entirely on the SAC to support these allegations, and fails to cite to any record evidence.

[7] Captain Steven Murray described a typical strip search conducted at ACCF as follows: "[An officer would] tell [the detainees] to run their fingers through their hair, open their mouth, put their tongue out, the officer would look. Put your arms up so that we can see the armpits.  They would have to lift up their testicles, show us that they weren't

a Consent Form, or there was "reasonable suspicion that a weapon, controlled substance or contraband will be found." (Ex. G-3 to Defs.' Mtn., Atlantic County Policy & Procedure ("Policy") at 530.) The Consent Form stated:

> I understand that my circumstances do not merit subjection to a routine strip search of my person; I understand that in an effort to protect inmates and staff, inmates that are not strip searched upon admission to the facility may be segregated from the general population and/or placed in otherwise higher security housing; as such are not necessarily direct consequences of not being strip searched, it is without any coercion that I do voluntarily consent to be strip searched.

(Ex. G-1 to Defs.' Mtn., Consent Form.) The "higher security housing" refers to a "cell by themselves in admissions until they are reviewed by classifications." (Muray Dep. 114:5-18.) If a non-indictable detainee chose not to sign the Consent Form, the Policy directed that an Admissions officer would conduct a "pat frisk," after which the arrestee would change into county issued clothing and have his own clothing inspected by an officer. (Ex. M to Defs.' Mtn., Policy at 609.) The arrestee would be placed in Admissions pending a review by Classifications or his release. (Id.) An incident report was directed to be filed in these instances. (Id.)

Plaintiffs dispute the fact that ACCF actually followed this Policy, and instead allege that ACCF instituted a "blanket strip-search policy." (SAC ¶ 15.) They point to the fact that the Policy required a report to be filed if an arrestee refused to sign the Consent Form, (Ex. V to Pls.' Opp'n to Defs.' Mtn., Policy at 594), but that no such reports exist. (Pls.' Opp'n to Defs.' SUMF ¶ 12.) Plaintiffs deny that any person who did not sign the form was not strip searched, because they claim that all persons signed. (Pls.'Opp'n to Defs.' SUMF ¶ 17.) Defendants claim that "[t]he majority of persons committed for non-indictable offenses have signed the

---

hiding anything until we tell them to turn around where we are again, observing the person, tell them to bend over, spread their cheeks quickly. It's a real quick look and show us the bottom of your feet, make sure they are not hiding any drugs or other type weapons or any other type contraband that is not allowed into the facility." (Ex. H to Defs.' Mtn., Captain Steven Murray Deposition ("Murray Dep.") 72:11-73:1.)

consent form." (Murray Dep. 174.) Furthermore, Sergeant Bennett testified that he remembered one person who refused to be strip searched. (Ex. I to Defs.' Mtn., Deposition of Reginald Bennett ("Bennet Dep.") 23:23-24:7.) Finally, Defendants point to record evidence of at least one refusal to consent to being strip searched and the accompanying incident report. (Ex. A to Defs.' Opp'n to Pl.'s Mtn.)

The parties also offer conflicting evidence as to the manner in which the Consent Form was presented to arrestees, and the consequences for a detainee who chose not to sign the Consent Form. Plaintiffs point to statements made by officers in the Atlantic County Investigations Unit Reports that demonstrate that some officers did not explain the Consent Form to the detainees; rather, they just told the detainees to read and sign the Consent Form. (See, e.g., Ex. M to Pls.' Opp'n to Defs.' Mtn., Investigations Report at 703, 704, 706, 731.) At least one officer stated that he did not utilize the strip search form, but strip searched all detainees, including Moore, Dillard, and El. (Ex. G to Pls.' Mtn., Report of Officer Shaun Perry.) However, many officers stated that they did explain the form to detainees, either initially or upon their inquiry. (See, e.g., Investigations Report at 688, 693, 696, 729.)

Plaintiffs assert further that "[d]etainees who had balked but were advised of the consequences relented and signed." (Pls.' Opp'n to Defs.' SUMF ¶ 14.) The consequences Plaintiffs refer to—namely that a pat frisk would be conducted, a Sergeant would be notified, a report filed, and the detainee placed in a higher security area—are the very consequences enumerated in the Policy. (Ex. M to Pls.' Opp'n to Defs.' Mtn; Ex. V to Pls.' Opp'n to Defs.' Mtn.; Ex. M to Defs.' Mtn. at 609.) Captain Murray testified that detainees who did not consent "are not subject to anything happening to them. They have more access to the telephone. They

5

have a bathroom that they don't have to use in front of somebody else." (Murray Dep. 114:11-116:22.)

In addition, officers have testified that they do not force the detainees to sign the Consent Form, and it is up to the detainees to determine whether they will consent to the strip search. (See, e.g., Ex. V to Pls.' Mtn., Deposition of Jorge Barreto ("Barreto Dep.") 19:2-6; Ex. U to Pls.' Mtn., Deposition of Michael Kelly ("Kelly Dep.") 158:23-159:1.) Plaintiffs contend that officers were not trained on how to determine whether a detainee voluntarily signed the Consent Form, or "what should be said, if anything, to a newly committed person regarding his knowing or understanding of the consent form." (Kelly Dep. 159:11-20.)[8]

### C. ACCF Facilities

The facilities available at ACCF for the holding of detainees individually, apart from other inmates or detainees outside of the facility's general population, were extremely limited. (Defs.' SUMF ¶ 31.) Defendants present evidence that the only available cells that could have been utilized to house such detainees individually were the holding cells located in the Admissions area, which consists of eight cells. (Ex. N. to Defs.' Mtn., Affidavit of Lt. Michael Kelly ("Kelly Affidavit") ¶¶ 5, 6.) The number of incoming detainees processed through Admissions during the time period at issue averaged 10,810 per year, and could reach as many as 65 individuals per day. (Kelly Affidavit ¶ 7.) All incoming detainees were placed into one of the Admissions area holding cells pending the completion of the admissions process, which could take up to several hours. (Kelly Affidavit ¶¶ 8, 9.) Thereafter, the detainees would be

---

[8] Plaintiffs also attempt to establish that arrestees are confronted with a plethora of paperwork upon admission, including "1) a property exchange form…;2) an inventory of property received and 3) an inmate orientation sheet," along with the Consent Form. (Pls.' SUMF ¶ 23.) However, Plaintiffs cite to deposition testimony that is not included in their attached exhibits to support this proposition. Furthermore, Plaintiffs' citations to various forms only establish their existence, and do not determine the manner or order in which these forms were given to detainees—in fact, the cited forms do not even pertain to the named Plaintiffs. (See Exs. B, C, D, E, & F to Pls.' Mtn.)

transferred to the intake unit, where they were further housed pending medical clearance and the completion of classification, which could take another three days. (Kelly Affidavit ¶ 10.) Admissions cells were also used to hold inmates and detainees, in cells by themselves, who needed medical or mental health observation. (Kelly Affidavit ¶ 11.) At any given time, the number of inmates or detainees who had to be maintained individually in the Admissions cells ranged from two to eight per 24-hour period, and the cells in which they were housed were unavailable for any other use. (Kelly Affidavit ¶ 12.) As such, Defendants contend that, given these space constraints, it would have been a "practical and physical impossibility for [ACCF] to have housed each incoming non-indictable detained, alone in an individual cell, apart from the general population, from admission until such time as that detainee was seen by a judge or judicial officer." (Kelly Affidavit ¶ 14.)

### D. Procedural History

Plaintiffs filed a proposed class action Complaint on November 13, 2007. (Doc. No. 1.) Plaintiffs filed their First Amended Complaint on November 18, 2008. (Doc. No. 30.) On October 20, 2009, the Court granted in part Defendants' motion to stay proceedings pending the determination of an appeal to the United States Court of Appeals for the Third Circuit in the matter of Florence v. Board of Chosen Freeholders, Civ. No. 05-3619, from a summary judgment determination by Hon. Joseph H. Rodriguez of the District of New Jersey, in favor of the plaintiffs therein. (Doc. No. 46.) The Court permitted Plaintiffs' counsel to pursue a motion for partial summary judgment, challenging the constitutional validity of the consents obtained from non-indictable detainees, while the remainder of the proceedings were temporarily stayed pending the Third Circuit's decision in Florence. (Id.) The Court denied Plaintiffs' motion for partial summary judgment on August 3, 2010, finding that "[t]here is no testimony of record

indicating that any pre-trial detainees felt coerced to consent to a strip search by virtue of the [Consent] form," and that "the Court cannot hold, as a matter of law, that any consents obtained were not voluntary." (Doc. No. 63 at 6.)

The matter was administratively terminated on August 5, 2010, pending the resolution of the Florence appeal. (Doc. No. 64.) On September 21, 2010, the Third Circuit found in favor of the Appellants. 621 F.3d 296 (3d Cir. 2010). Plaintiffs in Florence thereafter filed a Writ of Certiorari with the United States Supreme Court, which writ was granted on April 4, 2011. 131 S. Ct. 1816 (2011). The Supreme Court upheld the Third Circuit and thus the constitutionality of the strip search procedures at issue in Florence on April 2, 2012. Florence v. Board of Chosen Freeholders, 132 S. Ct. 1510 (2012). On September 13, 2012, the Court entered an Order reopening this matter, and permitting Plaintiffs to file a motion for leave to file an amended complaint. (Doc. No. 98.)

Plaintiffs filed their SAC on May 28, 2013, (Doc. No. 113), which included the following proposed definition for their class:

> All persons who have been (1) detained at and/or placed in custody of the ACCF or any facility under the authority of Atlantic County (2) as a result of being arrested and/or charged with non-indictable offenses such as: civil enforcement offenses i.e., child support enforcement arrears, traffic offenses, petty disorderly offenses, disorderly persons offenses, misdemeanors, contempt proceedings, failure to pay financial fines, penalties and/or costs in like matters as set forth above, and/or failure to appear at any court proceedings on like matters above; (3) were strip-searched upon their entry into detainment and/or custody at the ACCF and/or were strip-searched prior to an appearance before a judge or judicial officer who had the authority to release the person as referred to above from detainment and/or custody at the ACCF and/or persons who appeared before a judge or judicial officer in the matters referred to above who were not released from detainment and/or custody and were strip-searched as set forth above, and (4) the strip-search was conducted and/or performed according to Atlantic County's blanket strip-search policy, that is, without reasonable suspicion and/or probable cause based on objective and articulable facts that the aforesaid person or persons possessed controlled dangerous substances, weapons and/or contraband. The Class period commences on or about November 8, 2005, and extends to the date on which Atlantic County and the

> ACCF are enjoined from, or otherwise cease to strip-search the person or persons referred to above.

(SAC ¶ 15.) Plaintiffs allege violations of the Fourth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983, and of the New Jersey Constitution, Article I, Paragraph 7, pursuant to the New Jersey Civil Rights Act ("NJCRA"), N.J.S.A. 10:6-2. (SAC, Count I.) They also allege a violation of the New Jersey Strip Search Statute, N.J.S.A. 2A:161A, pursuant to the NJCRA. (SAC, Count II.) Defendants and Plaintiffs each filed their respective motions for summary judgment pursuant to Fed. R. Civ. P. 56 on July 18, 2014. (Doc. Nos. 129, 130.)

## II. LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). A genuine dispute of material fact exists only if the evidence is such that a reasonable jury could find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "The substantive law governing the dispute will determine which facts are material, and only disputes over those facts 'that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" Oquendo v. Bettcher Indus., Inc., 939 F. Supp. 357, 361 (D.N.J. 1996) (quoting Anderson, 477 U.S. at 248). When the Court weighs the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996). The moving party may satisfy its burden either by "produc[ing] evidence showing the

9

absence of a genuine issue of material fact" or by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

If the party seeking summary judgment makes this showing, it is left to the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" Corliss v. Varner, 247 F. App'x. 353, 354 (3d Cir. Sept. 17, 2007) (quoting Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)).

In deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Credibility determinations are the province of the fact finder, not the district court. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

The standard for resolving a motion for summary judgment does not change when the parties file concurrent motions. See Clevenger, 208 F. Supp. 2d at 465 (noting the standard for considering cross-motions). Although a court may consider motions for summary judgment concurrently, it must resolve the motions independently. Williams v. Phila. Hous. Auth., 834 F. Supp. 794, 797 (E.D.Pa. 1993). The Court will view the evidence on each motion in the light

10

most favorable to the party opposing the motion.  Clevenger, 208 F. Supp. at 469.  A claim by each side that it alone is entitled to summary judgment "does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist."  Transportes Ferreos de Venezuela II CA v. NKK Corp., 239 F.3d 555, 560 (3d Cir. 2001) (citation omitted).  If the record reveals no genuine issues of material fact, then judgment will be entered in favor of the deserving party in light of the law and undisputed facts.  Iberia Foods Corp. v. Romeo, 150 F.3d 298, 302 (3d Cir. 1998).

### III.    DISCUSSION & ANALYSIS

####    A. Fourth Amendment Claim

Plaintiffs' Fourth Amendment claim in essence hinges on whether the circumstances of this case fall under the so-called "exception" articulated by the Supreme Court in the recent Florence decision.  Defendants urge this Court to grant summary judgment in their favor because, unlike the "blanket" policy that the Supreme Court upheld in Florence, Atlantic County's policy only allowed for searches where there was consent or a reasonable suspicion to search.  Thus, Defendants contend that they are entitled to judgment as a matter of law.  Defs.' Br. 11-15.  Plaintiffs argue that they must prevail as a matter of law on this claim because, since the non-indictable detainees were strip searched prior to classification and their actual introduction into ACCF's general population, the circumstances of the case fall under an exception to the Florence holding.[9] Pls.' Br. 26.

---

[9]   Plaintiffs also argue that Atlantic County's policy was not to conduct a strip search, but rather a "cavity search," according to the New Jersey Strip Search Statute's definition, N.J.S.A. 2A:161A-3.  Pls.' Opp'n Br. 17-18.  The statute defines a "body cavity search" as "the visual inspection or manual search of a person's anal or vaginal cavity."  In State v. Hayes, 327 N.J. Super. 373, 384 (App. Div. 2000), the court found that visually inspecting an inmate's anal cavity after ordering him to bend over and spread his cheeks was a body cavity search according to the statute.  In the instant case, at least one of the individual plaintiffs was required to spread his cheeks while an Officer

11

A discussion of the recent Florence decision is necessary to evaluate whether Atlantic County's policy falls within the limits of the Constitution.  In Florence, the Supreme Court held that an institution's policy of subjecting every incoming detainee who would enter into the general population to a strip search, regardless of whether there was reasonable suspicion that the detainee may be in possession of contraband, drugs, or weapons, did not violate the Fourth Amendment to the United States Constitution.  132 S. Ct. at 1523.  Petitioner Florence was arrested based on an outstanding warrant for failure to pay a fine that was erroneously in the Burlington County computer system.  Id. at 1514.  Florence was taken to Burlington County Detention Center, and then to Essex County Correctional Facility, and subjected to a strip search in each facility.  Id.  The practices at the institutions were to strip search every arrestee who entered the facilities, regardless of whether that person had been arrested for a non-indictable offense, even if there was no reasonable suspicion that the arrestee was concealing drugs, weapons, or other contraband.  Id. at 1514-15.  Emphasizing the serious health and safety concerns that prisoners and officers face in potentially allowing contraband or undetected disease into prisons, the Court found that the policies at issue were constitutional because they were necessary to meet the needs of the institutions.  Id. at 1523.  The holding specifically relates to detainees who were searched prior to their admission to the general population.  Id. at 1515.

---

looked in his rectum.  Furthermore, the deposition testimony of Captain Murray confirms that Officers would ask detainees to do the same when conducting the searches.
    While the type of search at issue may be considered a "cavity search" under the New Jersey Strip Search Statute, it is virtually identical to the type of search considered by the Supreme Court in Florence.  The Court offered the following explanation of the term "strip search":
> It may refer simply to the instruction to remove clothing while an officer observes from a distance of, say, five feet or more; it may mean a visual inspection from a closer, more uncomfortable distance; it may include directing detainees to shake their heads or to run their hands through their hair to dislodge what might be hidden there; or it may involve instructions to raise arms, to display foot insteps, to expose the back of the ears, to move or spread the buttocks or genital areas, or to cough in a squatting position.

132 S. Ct. at 1515.  Thus, for the purpose of analyzing the Fourth Amendment claim, this Court will consider the searches conducted at ACCF to be strip searches.

The Court was careful to mention that the circumstances before it "d[id] not require the Court to rule on the types of searches that would be reasonable in instances where, for example, a detainee will be held without assignment to the general population and without substantial contact with other detainees." Id. at 1522-23.  This so-called "narrow exception" might also apply where an arrestee has not yet been reviewed by a magistrate or other judicial officer.  Id. at 1523.[10]

The Fourth Amendment protects "[t]he right of the people to be secure in their persons … against unreasonable searches and seizures."  U.S. Const. amend. IV.  Reasonableness "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails."  Bell v. Wolfish, 441 U.S. 520, 559 (1979).  In the wake of Florence, it is clear that the need to strip search a detainee who will not be held separately and apart from the general population of a prison weighs more heavily than the personal rights of the individuals subjected to the search.  132 S. Ct. at 1523 ("[T]he search procedures at the [facilities] struck a reasonable balance between inmate privacy and the needs of the institutions.")

It is undisputed that the policy as written in Atlantic County during the period in question was not a so-called "blanket" policy; a non-indictable detainee could only be strip searched if he or she signed a Consent Form, or if there was reasonable suspicion that a weapon, controlled substance, or other contraband would be found.  Nonetheless, the parties dispute whether the policy as executed by Atlantic County officers was a de facto blanket policy.  In their opposition to Defendants' motion, Plaintiffs argue that a reasonable jury could conclude that ACCF's consent policy was pretext for such a blanket policy.  Pls.' Opp'n Br. 19.

---

[10] Part IV of the Opinion, in which the Court left open the possibility of an exception, was not joined by Justice Thomas.  Justice Roberts and Justice Alito each penned a concurrence in order to "leave open the possibility of exceptions."  Id. at 1523 (Roberts, J., concurring).

Pursuant to the Policy, a report must be filed if a detainee refuses to consent to a search; as no such reports exist, Plaintiffs argue that every person was strip searched regardless of whether consent was obtained. Pls.' Opp'n Br. 21. However, Defendants have produced evidence that, although almost all non-indictable detainees signed the Consent Form, some did not, and those that did not were not subject to a strip search. Plaintiff bears the burden of proving that the Policy was in fact a "blanket" policy, and pointing to a lack of reports simply does not meet that burden.

Furthermore, Plaintiffs argue that the lack of reports show that all persons actually signed a strip search form. This would seem to suggest that the strip searches were only conducted where consent was obtained, in accordance with the Policy. However, Plaintiffs interpret the lack of reports as proof that the Consent Forms were signed as a result of coercion by Defendants.[11] This Court agrees with Judge Rodriguez's previous ruling on Plaintiffs' motion for partial summary judgment on this issue: there is no particularized evidence suggesting that anyone's consent was the result of coercive measures on the part of ACCF. Plaintiffs' attempts to characterize the consequences that officers would relay to detainees if they refused to sign as coercive—thus causing the detainees to ultimately "relent" and sign—is simply unconvincing considering that the consequences complained of are those specifically referred to on the Consent Form and in the Policy itself. The one fact that Plaintiffs can point to in their favor is that El wrote "All Rights Reserve" on a Consent Form and was strip searched anyway. But even assuming that this undated Consent Form is from the time period at issue,[12] this single instance is

---

[11] The Court notes that this assertion also does not square with Plaintiffs' allegations that certain of the individually named Plaintiffs were strip searched despite a lack of Consent Form.

[12] As this Consent Form is undated, it is not clear that it relates to any of the times that El was arrested during the period at issue, especially since El claims that he was arrested 23 times in Atlantic County, and not all within the operative time period. (Ex. I to Pls.' Opp'n to Defs.' Mtn.)

simply not enough evidence for Plaintiffs to meet their burden that the Policy as carried out was a "blanket" policy due to coercion by prison officials.

More fatal to Plaintiffs' argument, considering the holding in Florence, whether Defendants' Policy was a de facto "blanket" policy is simply not a material fact. The Supreme Court held that a policy allowing for strip searches of all non-indictable detainees absent reasonable suspicion that the detainee was holding contraband is constitutional. Even if the Court were to agree with Plaintiffs that the Policy as applied by Defendants was a "blanket" policy, the holding in Florence clearly allows for such policies under the circumstances as they exist in this case. "In addressing this type of constitutional claim, courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security." Florence, 132 S. Ct. at 1513-14. This record contains no such evidence.

The so-called Florence "exception" cannot save Plaintiffs' claim. The exception may exist only if two circumstances are true: the arrestee's detention has not yet been reviewed by a judicial officer, and the arrestee can be held apart from the general population. Florence, 132 S. Ct. at 1523. The non-indictable detainees at ACCF who were strip searched were to be placed into the general population. See Kelly Dep. 75:8-14. Plaintiffs appear to argue that, because detainees were strip searched prior to their classification and released before they were actually introduced into the general population,[13] the exception applies. This argument fails both legally and logically.

The entire reason for conducting a search is to do so before a detainee would be admitted to his or her final housing location—whether that be the general population or elsewhere;

---

[13] The Court notes that neither party points the Court toward any evidence as to whether Plaintiffs were actually introduced into the general population.

15

otherwise the risks necessitating the strip search in the first place cannot be abated.  If the Court were to accept Plaintiffs' argument, then any strip search conducted before an inmate was classified and sent to his final location, even if he were slated to be held in the general population, could risk violating the Constitution if the detainee ends up not entering the general population for any number of reasons.

Moreover, Plaintiffs misconstrue the Supreme Court's words.  The question is not whether a detainee <u>actually</u> entered into the general population, but whether he <u>could be</u> held apart from the general population.  The <u>Florence</u> Court limited its general holding to detainees who "<u>will</u> be" admitted to the general population, <u>Florence</u> 132 S. Ct. at 1513 (emphasis added), and any exception was limited to circumstances where the detainee "<u>can</u> be" held apart from the general population, <u>id.</u> at 1523 (emphasis added).  Plaintiffs do not dispute that ACCF did not have the capacity to hold non-indictable detainees who did not consent to be strip searched in facilities removed from the general population.  The fact that some detainees may have been released before they entered into the general population does not put Plaintiffs within the <u>Florence</u> exception, because, even if they never actually made it to the general population, ACCF could not have housed them elsewhere.  Therefore, <u>Florence</u> dictates that Defendants are entitled to summary judgment on their Fourth Amendment claim.

### B.  State Law Claims

Plaintiffs allege a violation of Article I, Paragraph 7 of the New Jersey Constitution, as well as a violation of the New Jersey Strip Search Statute, N.J.S.A. 2A:161A <u>et seq</u>., pursuant to the NJCRA, N.J.S.A. 10:6-2(c).  It is generally established in the Third Circuit that a court may decline supplemental jurisdiction when federal claims are dismissed by way of summary judgment.  <u>Tully v. Mott Supermarkets, Inc.</u>, 540 F.2d 187, 196 (3d Cir. 1976) ("if it appears that

the federal claim . . . could be disposed of on a motion for summary judgment under F.R. Civ. P. 56, then the court should ordinarily refrain from exercising jurisdiction in the absence of extraordinary circumstances"); Simmerman v. Corino, 804 F. Supp. 644, 658 (D.N.J. 1992) ("[W]here a party's federal claims are disposed of on a summary judgment motion, the court should generally refrain from exercising supplemental jurisdiction over the remaining state claims."), aff'd, 16 F.3d 405 (3d Cir. 1993). Pendant jurisdiction is a matter of "discretion, not of plaintiff's right." City of Chicago v. Int'l College of Surgeons, 522 U.S. 156, 172 (1997). Because this Court grants summary judgment in favor of Defendants on the federal claim, the Court declines to exercise supplemental jurisdiction over all remaining state law claims and is therefore dismissing them.[14]

## IV. CONCLUSION

---

[14] Plaintiffs argue that this Court should exercise supplemental jurisdiction in order to reach the state law claims even if the federal claim is dismissed. They cite a litany of cases suggesting that a court should not exercise its discretion to dismiss the state law claims if the dismissal occurs at a late stage in the litigation. Pls.' Br. 27-28. Plaintiffs assert that it would be "grossly unfair" for the Court to decline to exercise supplemental jurisdiction in this case because, inter alia: substantial resources have already been expended, extensive discovery and briefing has taken place, significant judicial resources have been expended, and the case is many years old, in part due to the stay pending the Florence appeal. Pls.' Br. 28. However, this Court finds that, in analyzing the "principles of economy, convenience, fairness, and comity which underlie the pendent jurisdiction doctrine," it is best left to a state court to adjudicate the remaining claims. Int'l College of Surgeons, 522 U.S. at 172-73.
    First of all, the New Jersey constitutional claim would share the same analysis as the Fourth Amendment claim, as Article I, Paragraph 7 of the New Jersey Constitution is co-extensive with the federal right as it relates to strip searches. See State v. Hayes, 327 N.J. Super. 373, 383 (App. Div. 2000) (analyzing the New Jersey Strip Search Statute against the backdrop of applicable constitutional principles, finding that the state constitutional protection against strip searches is co-extensive with the federal right, or else the Strip Search Statute would be superfluous); State v. Stevens, 203 N.J. Super. 59, 67 (Law Div. 1984) (applying the same standard when analyzing whether a strip search was valid under both the New Jersey Constitution and the Fourth Amendment). Thus, it would be unnecessary for the parties to engage in additional discovery or to expend significant additional resources to litigate this claim in state court.
    Secondly, the claim pursuant to the New Jersey Strip Search Statute was not added until Plaintiffs filed their SAC on May 28, 2013. Virtually all of the time, expense and discovery engaged in which can be tied to this claim can only have occurred since then, and does not date back to the filing of this case in 2007. Even so, the Court thinks that much of the discovery that took place before the SAC is nonetheless relevant to the statutory claim. Finally, the stay was obtained for the purpose of resolving the federal issue, and should not militate against a resolution of the remaining issues in state court. The Court thinks it more proper for a state court to determine the extent of the New Jersey Strip Search Statute, and whether Defendants violated Plaintiffs' rights under that law.

For the foregoing reasons, Plaintiffs' motion for summary judgment is DENIED.

Defendants' motion for summary judgment is GRANTED.  An appropriate Order shall issue.



Dated: 3/18/2015                                                s/ Robert B. Kugler
                                                                                ROBERT B. KUGLER
                                                                                United States District Judge